```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------X
CARRIE HURDLE BRICKHOUSE,
                                                              MEMORANDUM
                         Plaintiff,                           & ORDER


        -against-
                                                              05 CV 5420 (SLT)
COMMISSIONER OF SOCIAL
SECURITY,

                         Defendant.
--------------------------------------------------X
```
TOWNES, U.S.D.J.

      Defendant's motion for judgment on the pleadings is granted. Plaintiff's cross-motion for judgment on the pleadings is denied. This memorandum briefly addresses Plaintiff's claims.

## BACKGROUND

      Carrie Hurdle Brickhouse ("Brickhouse," "Plaintiff" or "Claimant") filed an application for disability insurance benefits ("DIB") on October 12, 2001. (Administrative Transcript ("Tr.") 93.) The application was denied. (Tr. 83-85.) Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), retained counsel, and appeared on September 24, 2003 before ALJ Sol Wieselthier. The ALJ denied Plaintiff's application on April 13, 2005. (Tr. 12-25.) Plaintiff unsuccessfully sought review before the Appeals Council before filing the instant application with this Court.

      Brickhouse is 58 years old. She has a high-school education with some secretarial training. (Tr. 49.) Plaintiff worked at the Administration for Children's Services ("ACS") from 1986 through August 14, 2000 as an office aide. (Tr. 49.) Though most of the reports and

submissions in the record indicate that Plaintiff's disability stems from a 1999 work-related accident in which an elevator door closed on Plaintiff, injuring her back, left shoulder and arm, right hand and knees, (Tr. 102, 162), there is also evidence to indicate that Plaintiff's medical condition began prior to this incident. (*See*, *e.g.*, Tr. 247 ("Her symptoms have been long-standing, and have increased since an elevator door struck her in 1999.").)

Plaintiff complains of neck, shoulder, and back pain, as well as numbness and tingling pain in her hands. (Tr. 102.) She testified that she is able to go up and down the stairs in her home four to five times a day, is capable of driving approximately 30 minutes each way to doctor's appointments twice per week, drove 45 minutes to the hearing, shops on her own (although her parcels must be loaded into the car for her), and drives to visit friends and relatives 10 minutes away. (Tr. 42-46, 71.) Plaintiff testified that she cannot sit for more than 10 minutes or stand for over 15 minutes without experiencing some discomfort. (Tr. 61-62.) Plaintiff attends church three times a week for two to four hours, sitting, standing or kneeling. (Tr. 69.)

Plaintiff testified that she is 20 pounds overweight and "not as active." (Tr. 43.) She does not vacuum, experiences difficulty getting dressed because of the pain in lifting her arms yet is able to perform light dusting, cooks five times per week, and make beds. (Tr. 70-72.) Plaintiff claims to have stopped working because she was (and remains) in too much pain. (Tr. 78.)

In anticipation of her September 24, 2003 hearing, the ALJ subpoenaed several physicians who had treated Plaintiff, including Dr. Kathleen Kohut ("Kohut"), Plaintiff's primary care physician, whose records documented Plaintiff's complaints of neck, shoulder, back and hand pain, her difficulty reaching, feeling, and pushing and pulling. (Tr. 167-221.)

# DISCUSSION

A.  *Scope of Review*

Judicial review of disability insurance benefit determinations is governed by 42 U.S.C. § 1383(c)(3), which expressly incorporates the standards established by 42 U.S.C. § 405(g). In relevant part, § 405(g) provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" Thus, if the Commissioner's decision is supported by "substantial evidence" and there are no other legal or procedural deficiencies, then her decision must be affirmed. The Supreme Court has defined "substantial evidence" to connote "more than a mere scintilla[;] [i]t means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971). "In determining whether substantial evidence supports a finding of the Secretary, the court must not look at the supporting evidence in isolation, but must view it in light of other evidence in the record that might detract from such a finding, including any contradictory evidence and evidence from which conflicting inferences may be drawn." *Rivera v. Sullivan*, 771 F. Supp. 1339, 1351 (S.D.N.Y. 1991).

Nonetheless, the "substantial evidence" test applies only to the Commissioner's factual determinations; similar deference is not accorded to the Commissioner's legal conclusions or to the agency's compliance with applicable procedures mandated by statute or regulation. *See Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) ("This deferential ["substantial evidence"] standard of review is inapplicable, however, to the [Commissioner's] conclusions of law.").

Accordingly, the Commissioner's legal conclusions and compliance with applicable regulatory and statutory mandates are reviewed de novo.

B. *Disability Determinations*

In order to qualify for disability insurance, a claimant must be deemed "disabled" as the term is defined in 42 U.S.C. §§ 423(d)(1)(A), 1382c.

A person is "disabled" when:

> he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.

42 U.S.C.A. §§ 423(d)(1)(A); 1382c(a)(3)(A)(West Supp. 1997). A "physical or mental impairment" consists of "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C.A. §§ 423(d)(3); 1382c(a)(3)(D). Nonetheless,

> an individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B). The Commissioner determines whether a claimant meets the statutory definition of "disabled" in five, successive steps (the "Analysis"). *See* 20 C.F.R. § 416.920 (1996); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). These steps may be summarized as follows:

> (1) Is the claimant gainfully employed? If she is, then she is not disabled. If

she is not, then the analysis proceeds to the second step.

(2) Does the claimant have a "severe" impairment(s) – i.e., one that significantly limits her physical or mental ability to do basic work activities? If she does not, then she is not disabled. If she does, then the analysis proceeds to the third step.

(3) Does the claimant's impairment(s) meet or equal a "listed impairment?" If it does not, then the analysis proceeds to the fourth step. If it does, then she is disabled.

(4) Does the claimant's impairment(s) prevent her from doing her "past relevant work?" If it does not, then she is not disabled. If it does, then the analysis proceeds to the fifth and final step.

(5) Does the claimant's impairment(s), considered in conjunction with her residual functional capacity, age, education, and past work experience, prevent her from engaging in other substantial gainful work reasonably available in the national economy? If it does not, then she is not disabled. If it does, then she is disabled.

*Id.* Thus, one can only be deemed "disabled" at the third and fifth steps of the Analysis, whereas one can be deemed "not disabled" at every step except the third one.

In determining whether or not a particular claimant is "disabled," the combined effect of multiple impairments must be taken into consideration by the Commissioner:

> [i]n determining whether an individual's physical or mental impairment or impairments are of sufficient medical severity that such impairment or impairments could be the basis of eligibility under this section, the Commissioner of Social Security shall consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity. If the Commissioner of Social Security does find a medically severe combination of impairments, the combined impact of the impairments shall be considered throughout the disability determination process.

42 U.S.C.A. § 1382c(a)(3)(G). However, "[t]he burden of proving disability is on the claimant." *Mimms v. Heckler*, 750 F.2d 180, 185 (2d Cir. 1984). In weighing the medical opinion evidence, the ALJ is obligated to adhere to the rules set forth in 20 C.F.R. § 416.927(d). These rules

indicate that, generally, more weight is given to the following: (1) opinions provided by physicians who have actually examined a claimant; (2) opinions provided by a claimant's treating physicians; (3) opinions supported by objective relevant evidence; (4) opinions that are more consistent with the record evidence as a whole; (5) opinions of specialists about medical impairments related to their area of expertise; (6) opinions that may be supported by any other factors the claimant brings to the Commissioner's attention. *Id.* at § 416.927(d)(1) - (6). However, the Commissioner must give a treating physician's opinion "controlling weight" if his or her opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." *Id.* at § 416.927(d)(2). This is the so-called "treating physician rule."

If the Commissioner finds that the treating physician's opinion is not entitled to "controlling weight" then that opinion is assessed according to the aforementioned six factors, taking into consideration the length, nature and extent of the treatment relationship. *Id.* Nonetheless, certain ultimate conclusions remain the exclusive province of the Commissioner. These include the ultimate determinations of whether a claimant is "disabled" within the meaning of § 1382c(a)(3)(A), whether a claimant's impairment(s) meets or equals a "listed impairment," what the claimant's residual functional capacity is, and the final assessment of vocational factors in relation to the claimant's impairments. *Id.* at §§ 416.927(e)(1) - (2).

**The ALJ's Determination**

In performing the Analysis, the ALJ held that Plaintiff has not performed substantial gainful activity since the onset of the date she alleged her disability began, satisfying step one.

6

(Tr. 16.) Plaintiff's impairment was found to be serious, satisfying step two, but the ALJ found that her condition did not "meet or medically equal the clinical criteria of any impairment or condition found at the Listing of Impairments." (Tr. 17; *see also* 20 C.F.R. Part 404, Appendix 1, Subpart P, Regulation No. 4.)

Step four examines Plaintiff's residual functional capacity ("RFC"), meaning her ability to perform certain tasks associated with work, in light of her impairments. A claimant's RFC is not concerned with the type of impairment, but only the tasks a claimant remains able to perform *after* the abilities that are significantly impaired by the disability are removed. 20 C.F.R. § 416.945(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations."). In this case, the ALJ determined that Plaintiff has the residual functional capacity to perform her prior work as an office aide, based on Plaintiff's testimony and the following medical findings.

A.  *Dr. Akuoku*

Plaintiff was seen by Dr. Samuel Akuoku ("Dr. Akuoku") on January 9, 1999, three days following her accident. (Tr. 256.) He noted that Plaintiff was seen several times by him, and that, because the pain in her shoulder, neck, back and chest persisted, she was advised to see Dr. Emmanuel Asare ("Dr. Asare"), a Workers' Compensation physician. (*Id.*) A May 25, 1999 report of an x-ray of Plaintiff's left shoulder read:

> There is no evidence of fracture or other acute abnormality. Mild degenerative changes are noted in the region of the acromioclavicular joint and in the region of the greater tuberosity. Soft tissues are unremarkable.
>
> IMPRESSION: Mild degenerative changes. No acute abnormalities noted.

7

(Tr. 262.) X-rays of Plaintiff's left ankle taken on May 25, 1999 and January 12, 2002 revealed no abnormalities. (Tr. 255, 263.) A January 12, 2002 x-ray of Plaintiff's left knee indicated "no significant degenerative change . . . no fracture or dislocation." (Tr. 253.) The results of a Magnetic Resonance Image ("MRI") of Plaintiff's cervical spine on April 4, 2002 revealed "no abnormality of alignment . . . straightening of the normal curvature of the cervical spine due to muscular strain or spasm . . . C3-C4 and C4-C5 annular disc bulges [and] facet hypertrophy." (Tr. 252.) The report of an April 6, 2002 MRI of Plaintiff's left shoulder read, in part:

> The examination demonstrates no abnormality of the supraspinatus tendon. There is no evidence of rotator cuff tear. Spur formation is present in the acromioclavicular joint which impinges on the supraspinatus muscle. No joint effusion is demonstrated.

(Tr. 251.)

B.  *Dr. Asare*

Plaintiff first visited Dr. Asare (to whom she was recommended by Dr. Akuoku) on August 15, 2000. Dr. Asare noted that Plaintiff had a slow gait, was alert, and displayed no neurological deficits. (Tr. 118.) He also noted "significant guarding and tenderness over [the] cervical paraspinal area" and "[n]eck flexion and extension as well as left and right rotation were mildly tender and limited." (Tr. 119.) Plaintiff's chest was atraumatic, though her left shoulder suffered "significant tenderness" and "mild limitation of movement." (*Id.*) Dr. Asare's impression was "[t]raumatic derangement of cervical spine and left shoulder [rule out] herniated disc of c-spine and torn ligament of left shoulder." (*Id.*) Dr. Asare diagnosed Plaintiff with a sprained neck and shoulder and found her to be "temporarily completely disabled." (*Id.*)

C.  *Neville Flowers*

Plaintiff saw Neville Flowers, a licensed physical therapist, and reported neck and shoulder pains ranging between grades 5 and 10 (on a scale of 1-10), and tenderness along both paraspinal muscles and both upper trapezii. (Tr. 120, 123, 126.) Plaintiff also reported pain in the neck, back and shoulder. (Tr. 120-121, 123-124.)

D.  *Dr. Seo*

Dr. Kyung Seo, an impartial consultant, saw Plaintiff on October 25, 2001. (Tr. 127-128.) His report indicated that "both upper extremities show a normal range of extension of both shoulder joints." (Tr. 127.) Dr. Seo found "no muscular atrophy of shoulder muscles. Both the elbow joint and the wrist joint shows [*sic*] normal range of motion. No impairment of fine dextrous movements in either hands." (*Id.* at 127-128.) He also noted "[l]umbosacral spine shows increased lumbar lordosis . . . Lateral rotation and lateral flexion is 15 degrees with mild spasm of the paraspinal muscles of the lower back." (Tr. 128.) Dr. Seo concluded that (1) Plaintiff suffered from "[c]ervical and lower back derangement probably degenerative spondylosis and degenerative disc disease of the cervical vertebra and lower back area;" (2) that Plaintiff's ability to sit and stand was "slightly limited;" and (3) that her ability to bend, lift and carry heavy objects was "moderately limited." (Tr. 128.) X-rays taken revealed "moderate degenerative spondylosis" of the cervical spine, while x-rays of the lumbosacral spine and left shoulder revealed both to be "relatively well maintained." (Tr. 129-130.)

*E.     Dr. Kohut*

On September 16, 2002, Dr. Kohut, Plaintiff's primary care physician, noted Plaintiff's complaints of stiffness in her neck, Plaintiff's inability to extend her hand, numbness in the index fingers, swollen hands and joints. (Tr. 216-17.) Plaintiff saw Dr. Kohut again on September 30, 2002, and October 28, 2002, complaining of shoulder, arm, neck and back pain.

In assessing Plaintiff's ability to do work-related activities, Dr. Kohut noted that Plaintiff is limited in the ability to lift, carry, stand, walk and sit. However, Dr. Kohut could not make a medical determination as to the extent of Plaintiff's limits in performing these activities. (Tr. 227-228.) Though there is some evidence that Plaintiff's condition improved with medication, Dr. Kohut's records reveal that Plaintiff's complaints of pain have not subsided. (Tr. 191, 193.)

*F.     Dr. Bieber*

Plaintiff was referred to Dr. Bieber by Dr. Kohut and was first seen by Dr. Bieber on October 4, 2002. (Tr. 247.) Dr. Bieber's report to Dr. Kohut states, in part:

> Her symptoms have been long-standing, and have increased since an elevator door struck her in 1999. Walking, prolonged sitting and standing increases her symptoms. She also experiences shoulder pain, which also increased with the elevator door striking her in 1999.

(*Id.*) Dr. Bieber's impression was impingement syndrome of both shoulders, and he recommended physical therapy. (Tr. 248.) Another MRI performed on December 10, 2002 indicated a "[b]road posterior disc bulge at L4-5 protrud[ing] 4mm into the spinal canal acentric towards the right with a small right paracentral annular tear." (Tr. 246.) Electrodiagnostic testing of the muscles and nerves in Plaintiff's legs were within normal limits, according to a December 31, 2002 report by Dr. Bieber, while a March 11, 2003 report indicated a right

10

cervical radiculopathy. (Tr. 238-239, 241-242.)

Dr. Bieber also assessed Plaintiff's ability to do work-related activities, finding that Plaintiff can lift 15 pounds, can stand less than two hours per eight hour work day, must periodically alternate between sitting and standing, and is limited in pushing and pulling. (Tr. 265-268.) The reasons stated by Dr. Bieber were cervical radiculopathy and "broad disc bulge with annular tear." (*Id.* at 266.)

G.   *Dr. Cornacchia*

On May 5, 2003, Dr. Louis Cornacchia, a neurosurgeon, informed Dr. Kohut by letter of his impressions after reviewing an MRI Plaintiff underwent in May 2003. (Tr. 159.) Dr. Cornacchia noted that the MRI "demonstrate[d] degenerative disc disease," and a "broad L4-5 disc with a small paracentral annular tear, but [no] evidence of neural compression." Dr. Cornacchia recommended physical therapy and pain management over surgery. (*Id.*)

H.   *Dr. Sveilich*

On July 10, 2003, Dr. Norman Sveilich noted "limited motion of the affected shoulder" and that "[t]he opposite shoulder has full active range of motion." (Tr. 233.) Sveilich noted trapezial spasms and right shoulder calcific tendinitis and recommended a "[r]eturn to the office as scheduled." (*Id.*)

11

*I.     State Consultant*

A residual functional capacity assessment by a state consultant indicated that Plaintiff can occasionally lift 20 pounds, frequently lift 10 pounds, is able to stand or walk (with normal breaks) for a total of six hours per eight-hour work day, can sit (with normal breaks) for six hours per eight-hour work day, and is occasionally limited in the tasks of climbing, balancing, stooping, kneeling, crouching and crawling.  (Tr. 131-138.)

The ALJ concluded that "the treating sources' assessments that the claimant is unable to perform a full range of sedentary work and the opinion that the claimant was totally disabled are not supported by the medical findings of the treating and the examining sources." (Tr. 23.)  He concluded that Plaintiff maintains the residual functional capacity to perform her past relevant work as an office aide, a classification that precludes her receipt of disability insurance benefits. (*Id.*)  The ALJ noted that "the claimant indicated that her past work involved walking two hours, standing two hours, sitting two and a half hours, and frequently lifting less than ten pounds.  She performed sedentary work." (*Id.*)

# ANALYSIS

"While the opinions of a treating physician deserve special respect . . . they need not be given controlling weight where they are contradicted by other substantial evidence in the record." *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (citations omitted). "Genuine conflicts in the medical evidence are for the Commissioner to resolve." *Id.* (*citing Richardson*, 402 U.S. at 399); *see also* 20 C.F.R. § 404.1546.

Although Plaintiff makes frequent allusion to the ALJ's failure to consider the reports of the treating sources, *see*, *e.g.*, Pl. Cross-Mot. at 12 ("Notably lacking in the decision is any acknowledgment of the fact that every treating physician reports that the plaintiff has severe, intractable pain."); *id*. at 13 ("Has the ALJ ignore the "treating physician" rule? Yes."), she fails to identify a particular finding by a particular physician that the ALJ "ignored." However, as the findings of Drs. Bieber and Asare provide for the most limited RFC, the Court will consider whether the ALJ's treatment of the reports of these Doctors violated the treating physician rule.

Dr. Bieber's assessment of Plaintiff's RFC was not credited by the ALJ. (Tr. 22 ("Dr. Bieber did not provide findings to support his assessment of the claimant's ability to perform work-related activities.").) Dr. Bieber found Plaintiff unable to lift more than 15 pounds and unable to stand or walk for more than two hours per eight-hour work day. (Tr. 265) However, the record contains few findings of Dr. Bieber indicating significant injury. On October 4, 2002, Dr. Bieber noted that sensory examination was normal, Babinski's sign negative, and that passive range of motion in Plaintiff's shoulders was normal, though Plaintiff experienced pain during straight leg raises and lower back pain with trunk flexion and extension. (Tr. 247 - 48.)

13

A December 10, 2002 MRI revealed normal discs at L1-2 and L2-3. (Tr. 147.) The L3-4 disc was "normal in height and T2 signal with a broad posterior disc bulge which does not result in spinal canal or neural foraminal stenosis." (*Id.*) The L4-5 disc was also normal "but mildly diminished in T2 signal." (*Id.*) The report noted "[t]here is a broad posterior disc bulge protrusion up to 4mm . . . It demonstrates a small right paracentral annual tear. This disc bulge does not result in frank spinal canal stenosis." (*Id.*) At L5-S1, "the disc is moderately diminished in height but the T2 signal is maintained." (*Id.*) There was "no disc bulge/herniation or spinal canal stenosis." (*Id.*) Findings of a December 31, 2002 nerve conduction study and electrodiagnostic testing of Plaintiff's legs were normal. (Tr. 198-99.) A March 11, 2003 electrodiagnostic testing was consistent with a right cervical radiculopathy. (Tr. 238-239.) In response to a subpoena, Dr. Bieber submitted a residual functional capacity assessment that incompletely assessed Plaintiff's ability to perform certain tasks, failing to indicate the maximum weight Plaintiff can frequently lift or carry, and to explain the medical or clinical findings in support of his conclusions. (Tr. 265-268; *see also* 154-158 (incomplete RFC analysis filled out by Dr. Bieber prior to subpoena).)

     The ALJ also disregarded Dr. Asare's determination that Plaintiff was "temporarily permanently disabled," finding it "unsupported by the medical findings of the treating and examining sources, the lack of ongoing treatment and the claimant's activities." (Tr. 23.) Sufficient evidence in the record supports the ALJ's finding that Plaintiff is able to perform her past relevant work as an office aide, including the x-rays ordered by Dr. Akuoku, which revealed "*mild* degenerative changes, no acute abnormalities," and "no significant degenerative change." Though Dr. Asare's impression was that Plaintiff was "totally temporarily disabled," he noted

that she displayed no neurological deficits. Dr. Seo found no muscular atrophy, a "slight" limitation in Plaintiff's ability to stand and a "moderate" limitation in her ability to bend, lift, and carry heavy objects. Neurological testing failed to reveal significant abnormalities and it is noteworthy that Plaintiff's primary care physician could not evaluate Plaintiff's residual functional capacity. *Punch v. Barnhart*, No. 01-3355, 2002 WL 1033453, at *11, 12 (S.D.N.Y. May 21, 2002) (treating physician's "chart notes . . . do not show much other than subjective complaints," and ALJ "took into account all diagnostic tests" performed on plaintiff in evaluating claim of disability).

Moreover, Plaintiff's own testimony supports the ALJ's decision: she testified that she walks up and down the 12 steps in her home four to five times per day, drives 30-45 minutes, can stand for 15-minute intervals, can kneel and grasp objects with some pain and watches four hours of television per day, during which she alternates sitting, lying down and standing. (Tr. 42, 44-46, 61-62, 63-67.) Plaintiff also testified that she attends church three times per week for two to four hours and alternates between sitting, standing and kneeling. (Tr. 69.) Plaintiff indicated that her prior work as an office aide was essentially sedentary in nature, yet required her to walk for up to two hours, stand for up to two hours, sit for up to two-and-a-half hours, and lift and carry supplies as needed, and the residual functional capacity evaluation submitted by Dr. Kohut, a treating physician, indicates that she can do just that, provided she periodically shifts her weight while sitting and/or alternates between sitting and standing. (Tr. 103, 227-229.)

Though Plaintiff testified that she is unable to work due to pain, "[her] statements alone are not enough to establish that there is a physical or mental impairment." 20 C.F.R. § 404.1528. It is within the ALJ's discretion "to evaluate Plaintiff's credibility and to determine, in light of

15

the evidence, the true extent of any pain alleged by Plaintiff." *Rosado*, 868 F. Supp. at 473. The record undoubtedly shows substantial support for the ALJ's findings that Plaintiff's prior work as an office aide clerk did not exceed her residual functional capacity.

## CONCLUSION

The Commissioner's motion for judgment on the pleadings is granted. Plaintiff's cross-motion for judgment on the pleadings is denied. The Clerk of Court is directed to close the case.

SO ORDERED.

_____/s/_____
SANDRA L. TOWNES
UNITED STATES DISTRICT JUDGE

Dated: May 25, 2007
       Brooklyn, NY